HOKE, J., concurring; STACY and ADAMS, JJ., concurring in the concurring opinion of HOKE, J.
The city of New Bern, by its board of aldermen, upon a petition signed by about 150 citizens, passed the following ordinance:
"Section 1. Whoever establishes, maintains, operates or conducts a lumber yard or wharf where lumber is piled, stacked, or stored within the territory bounded by Johnson, East Front and Pollock streets and the channel of Neuse River shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined the sum of $10, and each day such business is maintained or conducted, or lumber is piled, stacked or stored in violation hereof shall constitute a separate and distinct offense:Provided, this ordinance shall not go into effect until 3 February, 1924."
The postponement in the operation of the ordinance until 3 February, 1924, was made at the instance of the counsel of the plaintiff, who was present and opposed its adoption. *Page 542 
That portion of the territory of the city of New Bern within which lumber yards and loading wharves or docks are prohibited by the provisions of this ordinance lies along the portion of Neuse River which has been used almost exclusively for residence purposes during the entire existence of the city since its foundation by de Graffenreid. William Attmore says in his diary in 1787, when he was at Neuse River on his first visit, that "almost all the docks, wharves and shipping were on the Trent River side of the town." Pictures of this water front made in 1865, when the town was occupied by Federal troops, show no wharf or dock in use for any purpose on the Neuse River front from the Justice wharf down to the south side of Broad Street, exactly as it is today.
It is in evidence that this part of the city facing Neuse River, although the city has a water frontage for several miles, has been absolutely open to view for above 100 years, and is the only part of the river fronts of either Neuse or Trent rivers so open. Along this part of the front many of the most prominent and well-known citizens of New Bern have resided, doubtless being largely influenced in the location of their homes by this fact. This section of the shore is not only a place of recreation to the people, but visitors enjoy the view and speak of it with admiration.
This is an action to restrain the enforcement of the above ordinance of the city. From the judgment of the court holding the ordinance invalid and continuing the restraining order, the defendants, the city of New Bern and Edward Clark, the mayor, appealed.
The charter of New Bern, Chapter 82, section 27, Private Laws 1899, provides: "Section 27. That the board of aldermen shall have power to make, and provide for the execution thereof, of such ordinances for the government of the city as it may deem necessary, not inconsistent with the laws of the land. It shall have power, by all needful ordinances, to secure order, health, quiet and safety within the same and for one mile beyond the city limits. It may require the abatement of all nuisances within the city at the expense of the person causing the same, or of the owner or tenant of the ground whereon the same shall be."
C. S., 2787, provides: "In addition to and coordinate with the power granted to cities in subchapter 1 of this chapter, and any acts affecting such cities, all cities shall have the following powers:
"6. To supervise, regulate or suppress, in the interest of public morals, public recreations, amusements and entertainments, and to *Page 543 
define, prohibit, abate, or suppress all things detrimental to the health, morals, comfort, safety, convenience, and welfare of the people, and all nuisances and causes thereof.
"7. To pass such ordinances as are expedient for maintaining and promoting the peace, good government, and welfare of the city, and the morals and happiness of its citizens, and for the performance of all municipal functions.
"16. To regulate, control, and prohibit the keeping and management of houses or any building for the storage of gunpowder and other combustible, explosive, or dangerous materials within the city, and to regulate the keeping and conveying of the same, and to authorize and regulate the laying of pipes and the location and construction of houses, tanks, reservoirs, and pumping stations for the storage of oil and gas.
"26. To prevent and abate nuisances, whether on public or private property.
"27. To regulate and prohibit the carrying on of any business which may be dangerous or detrimental to health.
"28. To condemn and remove any and all buildings in the city limits, or cause them to be removed, at the expense of the owner or owners, when dangerous to life, health, or other property, under such just rules and regulations as it may by ordinance establish; and likewise to suppress any and all other nuisances maintained in the city."
In R. C. L., sec. 140, p. 834, it is said: "Aesthetic considerations have furnished the motive for the enactment of numerous regulations relating to the maintenance of billboards, etc. . . . Aesthetic purposes are not infrequently promoted by restrictions which are supported by other considerations quite within the domain of the police power, and it is the question whether a particular restriction is in fact so supported that affords the only ground for serious contention at the present day, for it is almost unanimously held that a municipality cannot, without compensation, by virtue of the police power alone, limit, for purely aesthetic purposes, the use which a person may make of his property," etc.
This expresses the uniform trend of legislation in regard to municipalities which are coming to be viewed not only as instrumentalities for the enforcement of law and order, but for the abolition of unsightly places and sounds and for the enhancement not only of the physical conveniences such as lights, water and sewerage, but for the preservation and improvement of the surroundings that will be pleasing to the eye and make the city more desirable as a place of residence. In short, the scope of the city government is not restricted to its primitive uses of the protection of life and limb and for the accommodation of business, but can embrace the preservation of the attractions as a place of *Page 544 
residence, though a regulation for the latter purpose alone cannot be sustained except upon compensation under the right of eminent domain.
The opinions and decisions of the highest courts of California, Nebraska, and Illinois holding valid ordinances regulating and prohibiting the establishment and maintenance of lumber yards, laundries, brick yards, etc., under the police power, in certain specified districts of a city, have been especially numerous. Also the Supreme Court of the United States has passed upon the validity of an ordinance almost in the exact terms of this before us. Hadacheck v. Sebastian, 239 U.S. 394; Reinman v. LittleRock, 107 Ark. 174, affirmed on writ of error, 237 U.S. 171. Among other cases sustaining ordinances in regard to lumber yards are In re Montgomery,163 Cal. 457; Anno. Cas., 1914 A, 130 and notes; Chicago v. Ripley,249 Ill. 466; 34 L.R.A. (N.S.), 1186. In Ex parte Quong Wo, 161 Cal. 220, the ordinance was sustained as to a laundry.
In Reinman v. Little Rock, 107 Ark. 174; 237 U.S. 171, it was a livery stable. In In re McIntosh, 211 New York, 265, it was sustained as to a garage; and in Kittenbrink v. Withnell, 91 Neb. 101; 40 L.R.A. (N.S.), 898, and in Ex parte Hadacheck, 165 Cal. 416; L.R.A., 1916 B, 1248, and notes; and in Hadacheck v. Alexander, 169 Cal. 259; also in Hadacheckv. Sebastian, 239 U.S. 394, an ordinance was sustained prohibiting brick yards to be maintained in certain districts or in certain distances of a residential section. It is worthy of notice that said ordinances were almost in exactly the terms of the one before us.
In In re Montgomery, supra, where the ordinance of Los Angeles prohibiting lumber yards in residential districts was in question, the Court said: "It is shown that certain wooden buildings near petitioner's lumber yard were occupied for business purposes, but the return seeks to show by affidavit and by photographic exhibits that the lumber yard is situated in the midst of a section of the city devoted almost exclusively to residences. In any view of the evidence we cannot say that the city council violated the large discretion vested in it with reference to police measures of the kind here considered, and unless such abuse of discretion appears, courts are never inclined to nullify ordinances on the ground of their unfairness. . . . While lumber yards are not nuisances per se, it takes no extended argument to convince one that such a place may be a menace to the safety of the property in its neighborhood for various reasons."
In Reinman v. Little Rock, supra, affirmed on writ of error,237 U.S. 171, the ordinance of Little Rock prohibiting and regulating livery stables was considered by the Supreme Court of the United States, and as to the Federal questions involved, Mr. Justice Pitney for the Court says: "Granting that a livery stable is not a nuisanceper se, *Page 545 
it is clearly within the police power of the State to regulate the business, provided it is not asserted arbitrarily or with unjust discrimination so as to infringe the Fourteenth Amendment"; and adds: "It is well within the range of the power of the State to so regulate in the residence section of a city thickly populated. While such regulations are subject to judicial scrutiny upon fundamental grounds, yet a considerable latitude of discretion must be accorded the law-making power; and so long as the regulation in question is not shown to be clearly unreasonable and arbitrary and operates uniformly upon all persons similarly situated in the particular district, it cannot be judicially declared a deprivation of property rights."
In all the Hadacheck cases, supra, it appears that the land was purchased about 1902, containing about 8 1/2 acres, especially adapted for brickmaking, and there had been an investment of over $100,000; that when purchased the land was several miles from the city; that the business had been long in operation, but the city having grown in that direction it was taken into the city, and afterwards when a few houses or homes had been erected in the neighborhood, though at some distance from the brickyard property, the city passed an ordinance in terms very similar to the one before us. On writ of error to the Supreme Court, Mr. Justice McKenna, after passing on the fundamental Federal question involved along the same lines as Mr. Justice Pitney, as above quoted, said: "We think the conclusion of the Court is justified by the evidence, and makes it unnecessary to recite the many cases cited by the petitioner, in which it is decided that the police power of a State cannot be arbitrarily exercised. The principle is familiar, but in any given case it must plainly appear to apply. It is to be remembered that we are dealing with one of the most essential powers of government — one that is the least limitable. It may seem, indeed, harsh in its exercise, and usually is on some individual, but the imperative necessity for its existence precludes any limitation upon it when not exercised arbitrarily. A vested interest cannot be asserted against it because of conditions once obtaining. That would preclude development and fix the city forever in its primitive conditions. There must be progress, and if in its march private interests are in the way, they must yield to the good of the community. The logical result of petitioner's contention would seem to be that a city could not be formed or enlarged against the resistance of an occupant of the ground, and that if it grows at all, it can only grow amid the environment of the occupations that are usually banished to the purlieus."
In the above cases the residential section had gradually encroached upon the business and commercial. In the case at bar the business and commercial, occupying 90 per cent of the water front on both rivers, and *Page 546 
in the course of years having gradually used and pushed into this small section, seek to encroach on the remaining 10 per cent.
It is well settled, in view of the increasing scope of municipal powers for the benefit of the public, that the police power extends to all the great public needs. Camfield v. U.S., 167 U.S. 518, as to fencing; Baconv. Walker, 204 U.S. 317.
Under what circumstances the police power should be exercised to prohibit carrying on certain classes of business within certain specified districts is a matter of police regulation within the scope of the municipal authorities. New Orleans v. Murat, 119 La. 1003 (sanitary regulations); Barbier v. Connelly, 113 U.S. 27; Soon Hing v. Crowley,ibid., 703 (both prohibiting washing and ironing in certain localities).
It is primarily for the legislative body clothed with the police power to decide when and under what circumstances such regulations as the one in question are necessary and essential, and its determination in this regard, in view of its better knowledge of all the circumstances and of the presumption that it is acting with a due regard for the rights of all parties, will not be disturbed by the courts unless it can be plainly seen that the regulation has no relation to the purposes above stated, but is a clear invasion of personal or property rights under the guise of police regulation.
To this effect are the following cases (which cite, among others, the cases supra of Hadacheck, Kittenbrink, Montgomery, Quong Wo): CemeteryAsso. v. San Francisco, 140 Cal. 226; R. R. v. Omaha, 235 U.S. 121
(holding valid a city ordinance requiring a railroad to build an overhead crossing); Ins. Co. v. Lewis, 233 U.S. 389 (regulating fire insurance rates); and there are many other cases.
The reasons actuating the legislative body in enacting the regulation ordinance need not necessarily appear from reading the ordinance itself.Grumbach v. Lelande, 154 Cal. 685; Ex parte Tuttle, 91 Cal. 591. It has been repeatedly held, and we think without any case to the contrary, that it is not necessary that a business be a nuisance per se to be regulated. Among these, besides the cases above cited, are Rhodes v. Dunbar,57 Pa. 275; 98 Am. Dec., 221; Welsh v. Swasey, 193 Mass. 364 (limiting height of buildings); 23 L.R.A. (N.S.), 1160, and notes; Offield v. R. R.,203 U.S. 372 (condemning shares of stock in a railroad company).
The exercise of the police power should largely have reference to the conditions of climate and soil and to the particular situation and needs of each community. Oil Co. v. Ind., 177 U.S. 190; Clark v. Nash,198 U.S. 361; Bacon v. Walker, 204 U.S. 311. The length of time during which a business has existed in a particular locality does not make its prohibition for the future unconstitutional. R. R. v. Ill., *Page 547 200 U.S. 592; People v. Lead Works, 82 Mich. 471, nor is the size of the territory affected by the ordinance a criterion by which to judge its validity. Miller v. Wilson, 236 U.S. 373; L.R.A., 1915 F, 829.
That a statute will result in injury to some private interest does not deprive the Legislature of the power to enact it, though it would be invalid where the purpose is primarily the appropriation or destruction of property. Enos v. Hanff, 98 Neb. 245. A statute enacted within the police power will not be adjudged invalid because an omitted subject or locality might have been properly included. People v. Schweinler Press, 214 New York, 395; In re Smith, 143 Cal. 370.
The presumption is in favor of the validity of the ordinance and invalidity has not been imputed in this case by any evidence. On the contrary the evidence presented at the hearing, both before the board of aldermen and in the lower court, shows that the ordinance is necessary and proper for the comfort, safety and welfare of the public.
It is well settled that prohibition of industries or occupations in certain sections of cities is a valid regulation. Cronin v. People, 82 New York, 318; Newton v. Joyce, 166 Mass. 83; 55 Am. St., 385; Shea v. Muncie,148 Ind. 14; Ex parte Botts (Texas Criminal Reports), 44 L.R.A. (N.S.), 629 (keeping hogs). The city has a right to regulate an occupation by confining it within prescribed limits. Strauss v. Galesburg, 203 Ill. 234;White v. Bracelin, 144 Mich. 332; Ex parte Lacy, 109 Cal. 326; 38 L.R.A., 640, and many cases above cited.
As to the section protected by this ordinance, not solely for aesthetic reasons, but by reason of menace from fire and disturbances by noises incident to the unloading of motor trucks and great bargs by negroes and stevedores, and for the comfort and welfare of the citizens, and by the fact that it has been in all time past protected as a residential section, these were sufficient justification for the ordinance, apart from the fact that the ordinance is presumed to be valid, and there was no evidence to contradict the grounds upon which it was based. The fire risk from lumber yards and docks is greater no matter how piles are stacked than a dwelling house in the ordinary circumstances. To set aside and invalidate such an ordinance under these circumstances, which has been adopted by the board of aldermen upon the petition of a large number of its citizens, it must be shown that the city acted arbitrarily, unreasonably and unnecessarily.
The defendants also except to this method of proceeding by injunction against the enforcement of a city ordinance. We have several times held that no injunction or equitable proceeding will lie against a municipal ordinance. Remedy is never given in equity when it can be obtained at law. In Wardens v. Washington, 109 N.C. 21, it was held: "An injunction will not be granted to prevent the enforcement *Page 548 
of an alleged unlawful municipal ordinance; nor can an action be maintained which only seeks to have such ordinance adjudged void."
In Scott v. Smith, 121 N.C. 94, it was held that "an application for injunction against the enforcement of a town ordinance alleged to be void is a misconception of the remedy as a court of equity will not interpose when the plaintiff's proper remedy is a civil action at law for damages."
In Vickers v. Durham, 132 N.C. 890, the above two cases and also Cohenv. Comrs., 77 N.C. 2, and Busbee v. Lewis, 85 N.C. 332, are cited for the proposition that an injunction will not lie against an alleged invalid city ordinance, the Court saying that a court of equity will never interpose when a party has an adequate and effectual remedy at law.
In Paul v. Washington, 134 N.C. 364, this matter is very fully discussed where there was an ordinance which required that saloons should keep the windows and doors open so that interiors would not be concealed; that no partition should be used, and prescribing other provisions in the nature of prohibition, and the Court held in a very elaborate opinion byMr. Justice Montgomery (Justice Walker writing an able concurring opinion) that "an injunction does not lie against the enforcement of a municipal ordinance, the violation of which is a misdemeanor, for the reason that the State cannot be enjoined from the execution of its criminal laws."
In Hargett v. Bell, ibid., 395, it was held that an injunction would not issue to test the validity of a town ordinance, citing, among other cases,Cohen v. Comrs., 77 N.C. 2, in which Reade, J., said: "We are aware of no principle or precedent for the interposition of a court of equity in such cases," citing, also, 1 High Inj., sec. 20, that "there is no equitable jurisdiction to enjoin the commission of crime." These authorities and others to the same effect are cited with approval in the well-known case ofS. v. R. R., 145 N.C. 521.
The same ruling that an injunction will not lie against the enforcement of a city ordinance when there is a remedy by defense on the trial of an indictment for the misdemeanor for violation of the ordinance or by action for damages, has been recognized in all jurisdictions. 21 L.R.A., 86 and notes; 38 L.R.A., 328 and notes, and 2 L.R.A. (N.S.), 632 and notes, and in other cases in our own Reports. Indeed the whole matter has been very recently discussed and the same proposition asserted, citing the above and other cases, in Thompson v. Lumberton, 182 N.C. 260, where it is held that "The enforcement of the criminal law, whether by statute or valid ordinance, made punishable as a misdemeanor under general statute, cannot be interfered with by the equitable remedy of injunction. When its violation is made a *Page 549 
misdemeanor its validity may be tested by the one who is tried for violating it as a matter of defense, and we cannot invoke the equity jurisdiction of the court by an injunction on the ground that his remedy is inadequate, because an incorporated city or town cannot be made liable in damages in such matters."
It has been so often and fully settled that an injunction will not lie against the enforcement of an ordinance that we might well have been content to rest the decision in this case entirely upon that proposition, which has always been asserted and never denied by any decision in this State.
Owing, however, to the importance to the public welfare of the powers asserted by the ordinance in this case, we have very fully discussed and cited from the authorities in other States which hold that an ordinance for the purpose of the one in question is entirely valid and within the well recognized scope of the police power vested in the city authorities.
We are indebted for many of the authorities cited by us to the ability and industry of the eminent counsel for the defendant, in whose brief most of them can be found.
The decision appealed from must be
Reversed.